876 A.2d 287

TOWNSHIP OF PEMBERTON, PLAINTIFF–RESPONDENT, v. ROC-
CO AND ANTONIA BERARDI, DEFENDANTS–APPELLANTS,
AND FIRST UNION NATIONAL BANK; FARO SOLLENA D/B/A
ROMA PIZZERIA; D. FRYAR D/B/A FRYAR'S DRY CLEANING;
MICHAEL MATTIERO D/B/A BROWNS MILLS REMODELING;
JIAN ZHENG D/B/A GREAT WALL CHINESE RESTAURANT;
ERNEST BOZARTH D/B/A ERNIE'S BARBER SHOP; NANCY
BUCKWALD D/B/A FRONT ROW VIDEO; RITE AID CORPORA-
TION; STEVE RIVERA D/B/A CLEARVIEW LAUNDRY MAT;
JOHN HARP D/B/A DAIRY QUEEN; DR. MICHALE KAY, D.D.S.
AND STATE OF NEW JERSEY, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued April 27, 2005—Decided June 16, 2005.

Before Judges NEWMAN, AXELRAD and HOLSTON, JR.

*Peter H. Wegener* argued the cause for appellants, Rocco and Antonia Berardi (*Bathgate, Wegener & Wolf,* attorneys; *Mr. Wegener,* of counsel and on the brief; *Pamela Madas Snyder,* on the brief).

*Kenneth S. Domzalski* argued the cause for respondent.

The opinion of the court was delivered by

HOLSTON, JR., J.A.D.

Defendant, Rocco Berardi, owner of a strip mall named the "Browns Mills Shopping Center" in the Township of Pemberton (Pemberton), and defendant, Antonia Berardi, owner of an adjacent vacant piece of land, also considered part of the shopping center, appeal the Law Division's August 6, 2004 order denying defendants' motion for an order compelling Pemberton to file, record and serve a declaration of taking or otherwise abandon the proceedings pursuant to *N.J.S.A.* 20:3–25.[1]

We are called upon to decide whether, in a condemnation action where an application is made by a condemnee pursuant to *N.J.S.A.* 20:3–25 for an order compelling a condemnor to either file a declaration of taking and make the required deposit of compensation offered the condemnee or abandon the proceedings, the court is mandated to grant the relief sought or has discretion to determine whether the declaration of taking is warranted. We hold that the statutory provision requires the court to grant the application.

Pemberton, an entity duly authorized and empowered to acquire real property for public use by condemnation pursuant to the provisions of the Eminent Domain Act of 1971 (the Act), *N.J.S.A.* 20:3–1 to –50 and *N.J.S.A.* 40A:12–5(a)(1) and *N.J.S.A.* 40A:12A–8c of the Local Redevelopment and Housing Law (LRHL), adopted a redevelopment plan pursuant to the LRHL to acquire a fee simple interest in part of the lands owned by the Berardis and designated as Block 775, Lots 18 and 19 on the tax map of the Township of Pemberton (the property), based on Pemberton's contention that the property had long been plagued with an outdated and unappealing facade and obsolete parking and circulation arrangements characterized by patched pavement and potholes. Pemberton thereafter, by ordinance, authorized the acqui-

---

[1] The additional defendants in the caption to this opinion are various tenants of the Browns Mills Shopping Center. Defendant tenants are not represented in this case.

sition of the property for redevelopment in accordance with the redevelopment plan that it had previously adopted.

As required by *N.J.S.A.* 20:3–6, Pemberton attempted but was unable to acquire the property through bona fide negotiations with the Berardis. Pemberton had presented the Berardis with an offer for the property, accompanied by a complete copy of an appraisal made by a qualified real estate appraiser by regular and certified mail. The amount offered by Pemberton was $1,621,000, conditioned on the property being free of any material environmental contamination.

On September 30, 2002, Pemberton filed an order to show cause and complaint for condemnation pursuant to the Act against the Berardis and the named tenants occupying the shopping center. Simultaneous with the complaint, Pemberton filed a notice of *lis pendens* against the two parcels of property owned by the Berardis.

Shortly after the filing of the condemnation complaint, in January 2003 newly-elected Pemberton officials continued discussions with the Berardis to resolve issues concerning the property and its potential acquisition. Those discussions resulted in no action being taken by the Berardis to remedy the conditions at the shopping center that constituted the reason for the adoption by Pemberton of its redevelopment plan.

At or about the time that the condemnation complaint was filed, the Berardis filed an application for preliminary and final site plan approval with the planning board for the purpose of making several improvements to the property. That application included new pad sites for an expansion of one of its primary tenants, Rite–Aid, as well as for a new tenant, Dunkin' Donuts. Significant on-site improvements were also to be made for the other tenants, most of whom had been leasing premises in the shopping center for a substantial period of time due to its location in the town center of Browns Mills.

On June 23, 2003, the court appointed commissioners pursuant to *N.J.S.A.* 20:3–12. On November 6, 2003, the parties participated in a Commissioners' Hearing, and a Commissioners' Report was filed on or about November 10, 2003. Fair market value was determined by the commissioners to be $2,270,000. On November 18, 2003, the Berardis filed an appeal of the commissioners' decision.

During the two years that have elapsed from the beginning of negotiations between Pemberton and the Berardis to March 11, 2004, Pemberton has never filed a declaration of taking. Therefore, on March 11, 2004, the Berardis filed a motion to compel Pemberton to file a declaration of taking or abandon the proceedings pursuant to *N.J.S.A.* 20:3–25. On April 30, 2004, the trial court denied the motion to compel but ordered Pemberton to deposit the fair market value of $2,270,000 as determined by the commissioners with the Clerk of the Superior Court within thirty days. On May 18, 2004, Pemberton deposited $2,270,000 into the Superior Court Trust Fund Account as required by court order.

On June 22, 2004, more than three months after the date of its March 11, 2004 application for a declaration of taking, defendants renewed their motion to compel Pemberton to file a declaration of taking or abandon the proceedings pursuant to *N.J.S.A.* 20:3–25. On August 6, 2004, the trial court again denied defendants' application. The court, however, certified its decision as a final order on the declaration of taking issue pursuant to *Rule* 4:42–2. This appeal followed.

## I

The statute at issue, *N.J.S.A.* 20:3–25, states:

If within 6 months from the date of appointment of commissioners, the condemnor fails to file a declaration of taking, the court, upon application of any condemnee, and on notice to all parties in interest, *may* require the condemnor, at its election, to either file a declaration of taking and make the deposit hereinabove provided, or abandon the proceedings pursuant to section 35 hereof. For good cause and upon terms, the court *may* extend the time for the filing of such declaration of taking, but not more than 3 months after the commencement of the action.

[*N.J.S.A.* 20:3–25 (footnote omitted) (emphasis added).]

The Berardis argue the plain and ordinary meaning of the words of *N.J.S.A.* 20:3–25 require Pemberton to file a declaration of taking or abandon the proceedings. The Berardis contend that the condemnation action has interfered with business relations between themselves and their various tenants of the property. The Berardis claim that hardship also arises from the uncertainty as to Pemberton's intentions regarding the property. The Berardis assert that they, therefore, sought recourse by making the application provided to a condemnee by *N.J.S.A.* 20:3–25. They filed two separate motions to compel Pemberton to file a declaration of taking or abandon the proceedings. The court, however, in relying on the decision in *Borough of Tenafly v. Centex Homes Corp.*, 139 *N.J.Super.* 490, 354 *A.*2d 382 (Law Div.1975), denied both motions.

Pemberton argues that employing the fundamental concept of statutory interpretation of giving the statutory language its plain meaning sustains the trial court's ruling on the motion. The critical word subject to interpretation is the Legislature's use of the word "may" in both sentences of the statute. Pemberton contends that for the court to adopt the position urged by the Berardis, the word "may" must be interpreted as being mandatory and not permissive. Pemberton argues that if the Legislature intended the language to be mandatory, it would have been so stated. Pemberton claims that the word "shall" would have been used rather than the word "may" to avoid ambiguity. Applying the statute's permissive language to the interpretation, Pemberton contends, would provide a reasonable result.

Pemberton suggests that the following is the correct interpretation of the statute: First, the condemnee has the right to file an application to require the condemnor to file a declaration of taking if the condemnor does not do so within a timeframe that is set forth in the first sentence of the statute. The court is then called upon to decide, in its discretion, whether the declaration of taking "may" be warranted on the facts of the particular case that is

presented to it. The second sentence of the statute provides the court with further discretion with respect to the filing of the declaration of taking. Specifically, that discretion is directed to whether the declaration of taking is to be filed immediately or to impose a period of time for it to be filed, which is not to exceed three months after the commencement of the action by the condemnee.

Pemberton submits that the court first has the discretion to decide whether or not the declaration of taking is warranted in a particular case. If it decides that action would be appropriate, it then has further discretion under the statute to set the filing date for the declaration of taking. Pemberton argues that the word "may" as used in the first sentence of the statute does not divest the court of its discretion to determine whether or not the condemnor is required to even file a declaration of taking.

When construing the meaning of a statute, the court must first consider the plain meaning of the words in the provision. *Burns v. Belafsky*, 166 *N.J.* 466, 473, 766 *A.*2d 1095 (2001) (citing *State v. Hoffman*, 149 *N.J.* 564, 578, 695 *A.*2d 236 (1997)). Unless the legislative intent instructs otherwise, the words and language at issue must be given their plain and ordinary meaning. *Ibid.* (citing *Merin v. Maglaki*, 126 *N.J.* 430, 434–35, 599 *A.*2d 1256 (1992)). "When 'the statutory language is clear and unambiguous, and susceptible to only one interpretation, courts should apply the statute as written without resort to extrinsic interpretive aids.'" *State v. Hodde*, 181 *N.J.* 375, 379, 858 *A.*2d 1126 (2004) (quoting *In re Passaic County Utils. Auth.*, 164 *N.J.* 270, 299, 753 *A.*2d 661 (2000)).

In interpreting a statutory provision, the court must consider the statute's wording, its context, its relationship to "other statutory provisions and the nature of the subject matter." *G.S. v. Department of Human Servs., Div. of Youth and Family Servs.*, 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999) (citing *State v. Brown*, 22 *N.J.* 405, 415, 126 *A.*2d 161 (1956)). The statutory provision "must be construed in concert with other legislative

pronouncements on the same subject matter so as to give full effect to each constituent part of an overall legislative scheme." *Hodde, supra,* 181 *N.J.* at 379, 858 *A.*2d 1126 (citation omitted).

There is a long line of both state and federal cases in which the word "may" has been construed in a mandatory sense. *City of Bayonne v. North Jersey Dist. Water Supply Comm'n,* 30 *N.J.Super.* 409, 417, 105 *A.*2d 19 (App.Div.1954) (explaining that the word "may" is to be afforded "a mandatory significance where it is employed in a statute to delegate a power, the exercise of which is important for the protection of public interests and where, it can clearly be taken from the nature and the object of the statute"); *Value Oil Co. v. Town of Irvington,* 152 *N.J.Super.* 354, 365, 377 *A.*2d 1225 (Law Div.1977)(stating that "[w]here logic and context are required to meet the ends of justice, ... courts have often interpreted 'may' as connoting a mandatory meaning[ ]" so that justice would not serve as "the handmaiden of grammar"), *aff'd,* 164 *N.J.Super.* 419, 396 *A.*2d 1149 (App.Div.1978), *certif. denied,* 79 *N.J.* 501, 401 *A.*2d 256 (1979); *Cohen v. Slavin,* 1 *N.J. Misc.* 621, 622, 126 *A.* 432 (Sup.Ct.1923) (stating that "the word 'may' used in [a] statute is mandatory, even if it appears to have been used in a permissive sense, leaving it to the discretion of the court as to whether or not the order shall be granted"). *See also, McBryde v. United States,* 299 *F.*3d 1357, 1364 (Fed.Cir.2002)(holding that payment under judicial litigation expenses statute is mandatory, rather than discretionary, "when the statutory conditions are met, and it is therefore money-mandating for purposes of vesting the Court of Federal Claims with jurisdiction under the Tucker Act"); *Wilson v. United States,* 135 *F.*2d 1005, 1009 (3d Cir.1943)(noting that the word "may" is normally construed with a mandatory meaning "where a public body or officer is clothed by statute with power to do an act which concerns the public interest, or the rights of third persons").

■ A review of these cases makes clear that (1) the word "may" has been used in a statutory context so as to denote a mandatory requirement and (2) determining whether or not "may"

is being utilized in a mandatory connotation requires a review of the legislative intent. For example, in *Harvey v. Board of Chosen Freeholders of Essex County*, 30 *N.J.* 381, 392–93, 153 *A.*2d 10 (1959), the Supreme Court found that the word "may" construed a mandatory requirement of retirement rather than a permissive one for all court attendants who attain the age of sixty-five and are also members of the retirement system. The Court rendered such findings after reconciling the statute along with its statement of purpose. *Id.* at 393, 153 *A.*2d 10.

In construing *N.J.S.A.* 20:3–25, it is also helpful to review the legislative history of the Act to determine what the Legislature intended. Paragraph F of Article III of the Eminent Domain Revision Commission Report reads:

> From time to time, agencies may institute proceedings, *but not take possession of the property until after an award has been made.* In the meantime, the owner is without funds to acquire substitute property and is unable to efficiently manage his property because of loss of tenants and inability to re-rent pendente lite. This is a great hardship to property owners, particularly to owners of small properties. It is recommended that if the condemning body does not take possession within three months after institution of the proceedings, any party in interest, upon application to the court, may require the condemning body to take such possession and make the deposit herein required *unless for good cause, the court shall direct otherwise.* [*Eminent Domain Revision Commission Report,* (1965) (emphasis added).]

The legislative history of the Act also includes the minutes of public hearings and the Governor's veto message. Further, the heading/title of *N.J.S.A.* 20:3–25, "Compelling condemnor to file declaration of taking," provides guidance as to the legislative intent. These documents, we are convinced, evidence the Legislature's intent to provide protections to property owners and compel the condemnor to either file a declaration of taking or abandon the proceeding, within a definite period of time. Additionally, the legislative intent to protect citizens is furthered by an interpretation of the statute that would compel Pemberton to either file a declaration of taking or abandon the proceedings.

"The purpose of *N.J.S.A.* 20:3–25 was to protect property owners." *Monmouth County v. Wissell,* 68 *N.J.* 35, 42, 342 *A.*2d 199 (1975). Justice Schreiber, writing for our Supreme Court,

noted that the Legislature incorporated the recommendations of the Revision Commission into Assembly Bill 504 that was eventually enacted into law. *Id.* at 40–41, 342 *A.*2d 199. Both the report of the Revision Commission and Assembly Bill 504 indicated that in the event the condemnor failed to file a declaration of taking, the property owner could require that the condemning authority either file a declaration of taking or abandon the proceedings. *Id.* at 42, 342 *A.*2d 199.

Other legislative history regarding *N.J.S.A.* 20:3–25 further suggests that the Legislature intended to give property owners protection against the condemnor's improper use of the powers of eminent domain. For example, when Governor Cahill conditionally vetoed Assembly Bill 504, he wrote that he concurred in the legislation, which would " 'make uniform the legal requirements for all entities and agencies having the power to condemn' and which 'would increase protection to the citizen whose property is condemned.' " *Id.* at 40, 342 *A.*2d 199. Nothing in the veto message gave any indication of a purpose other than the intent to afford property owners the opportunity to compel the condemning authority to file a declaration of taking and take possession of the property or abandon the proceedings.

Additionally, during public hearings before the Revision Commission, commentators raised concern regarding "frozen" property. "Frozen property" is property that essentially becomes useless to the owner because a condemning authority has announced it will take a piece of property but then fails to do so. Commentators also voiced concern regarding situations where the condemning authority seeks permission to take possession of certain lands but then does nothing for a year or more. For example, the Revision Commission considered a report on condemnation by the Committee on Real Property Law, Association of the Bar of the City of New York, which noted that "[t]he delay between formal announcement of the plans and actual acquisition of property has resulted in serious consequences to financially responsible businessmen and individual homeowners."

In light of the legislative history and the comments considered by the Revision Commission, a fair reading of the true intent underlying *N.J.S.A.* 20:3–25 is that it was enacted to ameliorate perceived hardships, inequality and unfairness to the property owner. Indeed, this is the only interpretation that makes sense with regard to the changes made after Governor Cahill's veto message. Any other interpretation would violate the Governor's objective expressed in the veto message that the proposed legislation "would increase protection to the citizen whose property is condemned."

This case exemplifies the very reason for the enactment of *N.J.S.A.* 20:3–25. More than two years ago, Pemberton filed an order to show cause and complaint in condemnation. The complaint named as defendants not only the Berardis as property owners but also all the current tenants. As a result of the condemnation action, the property owner has been relegated to a state of uncertainty as to whether Pemberton will ever take possession or title to the property. Additionally, the Berardis may be placed in an uncertain position with their tenants. Accordingly, *N.J.S.A.* 20:3–25 must be read as providing the property owner with the right to compel the condemning authority to either file a declaration of taking or abandon the condemnation action. If the condemning authority comes forward with good cause, then the court may give the condemnor an additional three months within which to act.

## II

Pemberton relies on the decision in *Centex* as controlling authority for its position. *Centex* involved the condemnation by the Borough of Tenafly (Tenafly) of an area of land owned by Centex Homes Corporation (Centex) in that community's East Hill district. *Id.* at 493, 354 *A.*2d 382. After an extensive commissioners' hearing, the commissioners' report was issued which determined the amount of compensation to be paid for the property as $6,600,000. *Ibid.* The commissioners' award was then duly appeal-

ed by Centex, and a trial date was scheduled. *Ibid.* Centex made a motion pursuant to *N.J.S.A.* 20:3–25 to compel Tenafly to file a declaration of taking and to make a deposit of $6,600,000 with the clerk of the court or to abandon the condemnation action pursuant to *N.J.S.A.* 20:3–25. *Id.* at 494, 354 *A.*2d 382. The court determined that the Act entitled the court to use discretion in determining whether or not to require Tenafly to file a declaration of taking, deposit funds with the court or to abandon the proceedings. *Id.* at 500–01, 354 *A.*2d 382. The court stated:

> In the instant case, however, Tenafly has not taken possession of the property. Indeed, Tenafly does not want the land until it irrevocably decides whether to pay the ultimate judgment. Centex has full possession. The court, of course, recognizes that there are both *de facto* and *de jure* restrictions placed upon Centex's use of the land by Tenafly. The court is also aware that Centex has been paying real property taxes on the land and that Tenafly has utilized these tax receipts in its municipal budget.
>
> In order to alleviate the hardship suffered by Centex at the hands of Tenafly—a hardship, by the way, which is neither greater nor less than that suffered by other types of condemnees—the Court orders Tenafly to deposit with the clerk of the court the amount of $6,600,000. This deposit shall be made within 45 days of the signing of the order incorporating the court's disposition of this motion. If Tenafly fails to make the deposit, the court will require Tenafly to abandon the proceedings pursuant to *N.J.S.A.* 20:3–35 unless for good cause shown the court shall direct otherwise.
>
> However, in the exercise of its discretion under *N.J.S.A.* 20:3–25[,] the court will not require Tenafly to file a declaration of taking. The theory of the Eminent Domain Act is to protect the condemnee. The declaration of taking was created as a device to put persons on notice of an impending condemnation action and to trigger the transfer of possession from the condemnee to the condemnor. It does no violence to the act whatsoever to separate the declaration of taking from the deposit in appropriate cases. Tenafly does not seek possession of the property at this time. There is no reason to implement a transfer of title at this time. However, Tenafly does have the obligation to compensate the landowner for the estimated value of the property. The deposit serves this purpose at this time. The effect of the court's decision, then, is to compensate Centex now and to allow Tenafly the option to abandon the proceedings at some time in the future. Centex is in no way prejudiced by this determination. If, after trial, Tenafly accepts the final judgment, then Centex will be fully compensated. If, however, Tenafly decides to abandon the proceedings, then Centex will be entitled to its costs and, without determining the issue now, will probably be entitled to additional compensation in the form of (1) interest, or (2) the value of an option to purchase under the principles of *Lomarch Corp. v. Englewood,* 51 *N.J.* 108, 237 *A.*2d 881 (1968), or (3) the value of a temporary *de facto* taking under the principles of *Washington Market Enterprises v. Trenton,* 68 *N.J.* 107, 343 *A.*2d 408 (1975), or (4) the value of

some as yet unrecognized and undetermined interest. In the event of an appeal from the trial *de novo* the $6,600,000 will protect Centex's current interests until there is a final adjudication.

[*Centex, supra,* 139 *N.J.Super.* at 500–01, 354 *A.*2d 382.]

We are convinced that the court in *Centex* misconstrued *N.J.S.A.* 20:3–25. Adopting that court's interpretation would require us to read words into the statute which the Legislature did not write. The first sentence of the statute does not grant the court unfettered discretion to decide whether a condemning authority should be required to file a declaration of taking or abandon the act of condemnation. If such authority were intended to be granted to the court, the Legislature would have used language such as "or take such other action as the court deems equitable and just." The express language of the statute does not grant such an option to the court. As we explained in *State v. Malik,* 365 *N.J.Super.* 267, 278, 839 *A.*2d 67 (App.Div.2003), *certif. denied,* 180 *N.J.* 354, 851 *A.*2d 648 (2004), a court will "not presume the Legislature intended something other than what it expressed by way of its plain language." (citing *State v. Wright,* 107 *N.J.* 488, 495, 527 *A.*2d 379 (1987)). *See also, McQueen v. Brown,* 342 *N.J.Super.* 120, 131, 775 *A.*2d 748 (App.Div.2001) (warning that appellate courts must "not presume that the Legislature intended something other than what it expressed in the language of the statute"), *aff'd,* 175 *N.J.* 200, 814 *A.*2d 1042 (2002).

Additionally, Pemberton's and the court's interpretation would, in effect, read the second sentence out of the statute. "There is a strong presumption against any legislative intent to find that an entire section of a statute, plain and unambiguous on its face, is a nullity on the ground that it is useless." *Wissell, supra,* 68 *N.J.* at 42, 342 *A.*2d 199 (citing *110–112 Van Wagenen Ave. Co. v. Julian,* 101 *N.J.Super.* 230, 236, 244 *A.*2d 123 (App. Div.), *certif. denied,* 52 *N.J.* 490, 246 *A.*2d 450 (1968)); *G.E. Capital Mortgage Servs., Inc. v. Marilao,* 352 *N.J.Super.* 274, 281, 800 *A.*2d 150 (App.Div.2002) ("[N]o portion of a legislative enactment is assumed to be superfluous.").

*Centex* suggests that the second sentence of *N.J.S.A.* 20:3–25 is procedurally absurd. The second sentence reads: "For good cause and upon terms, the court may extend the time for the filing of such declaration of taking, but not more than 3 months after the *commencement of the action." N.J.S.A.* 20:3–25 (emphasis added). *Centex* construed the phrase "commencement of the action" as referring to the date of filing the condemnation complaint. We disagree.

General concepts of statutory construction teach us that statutes are to be read *in pari materia* with each other. *State in the Interest of G.C.,* 179 *N.J.* 475, 481–82, 846 *A.*2d 1222 (2004) ("When reviewing related statutory provisions[,] [the court] generally consider[s] them *in pari materia,* harmonizing their meaning with the Legislature's intent."); *Walcott v. Allstate New Jersey Ins. Co.,* 376 *N.J.Super.* 384, 391, 870 *A.*2d 691 (App.Div.2005) ("When statutes deal with the same subject, they should be read *in pari materia* and construed so that, to the extent possible, each can be given its full effect.").

 *N.J.S.A.* 20:3–2, the definitional section of the Eminent Domain Act, defines "action" as follows:

(g) "Action" means the legal proceeding in which

(1) property is being condemned or required to be condemned;

(2) the amount of compensation to be paid for such condemnation is being fixed;

(3) the persons entitled to such compensation and their interests therein are being determined; and

(4) all other matters incidental to or arising therefrom are being adjudicated.

Clearly, the definition contained in paragraph (g)(4) above refers to the date the condemnee files the application contemplated by the first sentence of *N.J.S.A.* 20:3–25 to compel the condemnor to either file a declaration of taking and make the deposit pursuant to *N.J.S.A.* 20:3–18 or abandon the proceedings.

*N.J.S.A.* 20:3–18 provides:

Simultaneously with the filing of the declaration of taking, the condemnor shall deposit the amount of such estimated compensation with the clerk of the court. The amount so deposited shall be not less than the amount offered pursuant to section 6 hereof, and if an award has been made by commissioners hereunder, or a

judgment determining compensation has been entered at the time of the filing of such declaration, the amount so deposited shall be not less than the amount of such award or judgment.

Any amount so deposited shall not be subject to the fees set forth in *N.J.S.* 22A:2–20.

Moreover, *N.J.S.A.* 20:3–35, specifically allows the condemnor to abandon the proceedings "at any time before or within 30 days after the entry of judgment. . . ." The statute reads:

> Any action hereunder may be abandoned at any time before or within 30 days after the filing of the award of commissioners; or in the event of an appeal from such award, at any time before or within 30 days after the entry of judgment; *or in the event that a hearing before commissioners shall have been waived, at any time before or within 30 days after judgment has been entered in said action;* provided, however, that *no such action shall be abandoned after the filing of a declaration of taking pursuant to Article V hereof, or after the vesting of title in any condemnor pursuant hereto;* and provided further, that (a) a discharge of the notice of lis pendens is filed, and (b) the condemnor shall pay the expenses of all condemnees who have appeared in the action. Nothing herein shall preclude abandonment at any time by mutual consent of the parties.
>
> [*N.J.S.A.* 20:3–35 (footnote omitted) (emphasis added).]

*Centex* reasoned that a declaration of taking was a device created "to put persons on notice of an impending condemnation action and to trigger the transfer of possession from the condemnee to the condemnor." *Id.* at 501, 354 *A.*2d 382. Therefore, the court concluded that the separation of the transfer of title and the making of the deposit did not do violence to the Act. *Ibid.*

The court's expressed "understanding" of the Act, we believe, is contrary to the intent of the legislation. The filing of the complaint and service of process achieve notice of a condemnation action. These actions must occur before or contemporaneous with the filing of the declaration of taking. Even if some ambiguity may exist as to the timeframe intended by the Legislature for the period from which the extension of time applies in the statute's second sentence, there is no question that the Legislature intended to allow the court to extend the time for filing a declaration of taking for good cause and upon terms. The *Centex* interpretation renders *N.J.S.A.* 20:3–25 mere surplussage because it eviscerates

the timeframes within which a condemning authority must abandon condemnation proceedings.

Additionally, the basic tenets of statutory construction require that the words of a statute must be read so as to give meaning and effect to every provision. *Wissell, supra,* 68 *N.J.* at 42, 342 *A.*2d 199. The court's interpretation completely ignores the entire second half of *N.J.S.A.* 20:3–25. The *Centex* interpretation disregards the agreement by both counsel in *Centex* that the second sentence of *N.J.S.A.* 20:3–25 had meaning. Notably, the parties in *Centex* disagreed only as to the date from which the three-month extension should commence. We are convinced that the word "action" refers to an application by the condemnee/property owner by the filing of an application, motion or order to show cause to compel the condemnor to either file a declaration of taking and deposit funds representing fair market value with the Clerk of the Superior Court or abandon the action in accordance with *N.J.S.A.* 20:3–35. This reading not only makes sense but also carries out the original intent of the Revision Commission, Governor Cahill, and the Legislature as reflected in Article III, paragraph F of the 1965 Eminent Domain Revision Commission Report.

Moreover, the *Centex* interpretation would permit a condemnor to "freeze" the property in perpetuity by commencing a condemnation action but not taking possession or title to the property for years, in effect granting an indeterminate option. All the while, the commercial property owner could lose tenants, would be constrained in business choices and decisions and, yet, must continue to pay property taxes and remain liable for the property. The fact that money is deposited with the court does not give the owner any viable recourse. If the property owner chooses to withdraw the monies, he may then have to reimburse the money if the condemning authority decides several years later to abandon the action. *See N.J.S.A.* 20:3–23. The *Centex* interpretation of *N.J.S.A.* 20:3–25 keeps the property owner in a position of uncertainty regarding the status of his or her property, unable to make

any reasonable economic and investment decisions. We are satisfied that such uncertainty was never intended by the Legislature to last for an indeterminate period.

As indicated by the pleadings on file and the affidavits and certifications submitted to the trial court, the property owner has suffered the harm referenced by the Revision Commission in paragraph F of its report. In its brief and argument to the trial court, Pemberton contends that, as a matter of public policy, the municipality should be allowed to try its case to a jury verdict, and if the resulting verdict or acquisition price is higher than what Pemberton anticipated or can afford, then it can abandon the condemnation action and not take possession or title to the property. On the other hand, if Pemberton can obtain the property at a price it deems economically feasible, it will then take possession. This is not only an abuse of the eminent domain process and the eminent domain statute, but it reduces the court's and/or jury's role to that of a mere advisory opinion. Allowing the trial court's ruling to stand would implicitly allow a condemnor to continue the condemnation action to a jury verdict. Then, according to the representations by Pemberton, after forcing the property owner through the condemnation process, the condemnor may ultimately decide not take title but, rather, abandon the action. Valuable judicial resources would have been wasted.

Finally, we add the following observations. Based upon our review of the record, including counsels' statements elicited during oral argument, Pemberton's reason for pursuing its eminent domain action against defendants may have had as its motivation the obtaining of leverage to force compliance with various municipal ordinances, including possible building code violations. If this were the case, we are convinced that the filing of an eminent domain action against these or any other property owners would be an improper course for Pemberton to pursue. Rather, Pemberton should have more appropriately utilized the statutory remedies in applicable municipal ordinances or by seeking injunctive relief in the Chancery Division. We find no justification, let

alone legal authority, for Pemberton to rely on the Eminent Domain Act to enforce and remedy alleged municipal ordinance and building code violations. For example, in *Corbacho v. Mayor and Council of the City of Newark,* 16 *N.J. Tax* 240, 249 (App.Div. 1997), this court found that the city exceeded its authority in denying the plaintiffs' applications for tax abatements. As we explained:

> Although the Legislature conferred discretion upon municipalities to determine whether to grant tax abatements for new construction of residential structures in urban enterprise zones, *it required this discretion to be exercised by ordinance and in conformity with the enabling legislation. It did not confer discretion upon municipalities to grant or withhold tax abatements on an ad hoc basis for reasons which are not set forth expressly or by fair implication in the enabling legislation or implementing ordinance.*
>
> [*Ibid.* (citation omitted)(emphasis added).]

### III

We hold that the word "may" used in *N.J.S.A.* 20:3–25 is mandatory and not permissive, as evidenced by its legislative history and by the application of well-established principles of statutory construction. A condemnor, on a condemnee's application to the court, must either (1) file a declaration of taking and make the required deposit of compensation offered the condemnee pursuant to *N.J.S.A.* 20:3–18 or (2) abandon the proceedings pursuant to *N.J.S.A.* 20:3–35. The court retains discretion to extend the time for the filing of the declaration of taking for up to three months from the date the condemnee files the application.

We overrule *Borough of Tenafly v. Centex Homes Corp.,* 139 *N.J.Super.* 490, 354 *A.*2d 382 (Law Div.1975), because the opinion is contrary to the legislative intent to protect property owners and reads out of existence the second sentence of *N.J.S.A.* 20:3–25. The *Centex* interpretation would permit property to be "frozen" indefinitely by allowing a condemning authority to commence a condemnation action but not be required to take further action to obtain possession or title to the property.

We reverse the decision of the trial court and order that within thirty days of the date of this opinion, Pemberton shall either file a declaration of taking or abandon the property in accordance with *N.J.S.A.* 20:3–35. We do not retain jurisdiction.

Reversed and remanded.